IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

JAMES WATT                                                                    PLAINTIFF

V.                                            CASE NO. 05-CV-1084

GEORGIA-PACIFIC CORPORATION                                    DEFENDANT

**MEMORANDUM OPINION**

Before the Court is Defendant Georgia-Pacific Corporations's (GP) Motion for Summary

Judgment.  (Doc. 27).  Plaintiff James Watt has responded.  (Doc. 35-1).  GP has replied to

Watt's response.  (Doc. 40).  The Court finds the matter ripe for consideration.

At the outset, it should be noted that Watt originally brought this lawsuit against PACE,

the local branch of the Paper, Allied, Chemical and Energy Workers International Union, and

GP.  However, the claims against PACE have been dismissed.  (Doc. 25).  Therefore, this

opinion deals only with the claims against GP.

**I. BACKGROUND**

In September 2005, Watt brought suit against GP, alleging that he was wrongfully

discharged from his employment in violation of the Fair Labor Standards Act (FLSA), the

Americans with Disabilities Act (ADA), and the Arkansas Civil Rights Act (ACRA) and that his

termination violated the Collective Bargaining Agreement in place between GP and PACE.  Watt

was employed by GP as a beater engineer at GP's facility in Crossett, Arkansas.  He began his

employment with GP in 1991 and had performed the job of beater engineer since 1997.  As a

beater engineer, Watt was responsible for mixing the stock from which tissue was made for

machines four and five, which were the two machines to which Watt was assigned.

In 2001, GP and PACE agreed that certain positions on the tissue machines would be consolidated and that the beater engineer positions would be removed from the traditional line of progression and phased out over time.  After the beater engineer position was removed, each tissue machine was operated by three employees with one of these employees performing the functions previously performed by the beater engineer.  GP and PACE agreed that beater engineers were no longer assigned to a particular machine and could be assigned duties in any area of the tissue machine room.  The beater engineers were to be assigned "troubleshooting for all areas as necessary."

Once the phase-out process began, Watt continued to work primarily on machines four and five.  However, Watt was occasionally asked to work on other machines when another beater engineer was not present.  Watt also filled in for other absent members of the three-person machine crew.  Watt was asked to clean up around machines four and five and to clean up stock if a machine overflowed.

Watt suffered a back injury in 1993 or 1994 and subsequently underwent two surgeries on his back.  Watt stated that his back injury causes him pain when he stands still on a hard-surface floor "day in and day out."  Watt has difficulty sitting in certain types of chairs and difficulty sleeping when the weather is cold.  Watt generally  has no trouble lifting objects or walking.

In 2004, Watt testified in a criminal proceeding involving two GP employees.  Watt asserts that his supervisor, Larry Senn, was not happy with Watt's testimony.  Watt further asserts that, in retaliation for his unfavorable testimony, Senn assigned him extra duties that he could not perform because of his back problems.  These duties include picking up paper towel

waste under a machine and washing areas other than the areas around machines four and five.[1]

Watt claims that after he testified in the criminal proceeding, Senn more frequently ordered Watt

to perform job functions not typically performed by beater engineers.  Watt did not believe that

he should be required to perform the duties that Senn assigned to him, so Watt filed several

grievances with the PACE shop steward.  These grievances were resolved.

In late August 2004, Watt's supervisor told him to go under a machine to pick up towel

waste.  According to Watt, he could not do that because it jarred his back.  Watt testified that his

supervisor told him to go under the machine or he would be fired.  Later that same day, Stacey

Campbell, a company supervisor, found Watt lying on the floor of Campbell's office because

Watt's back hurt.  Watt told Campbell that he could not do what his supervisor had told him to

do, and Campbell advised Watt to go home so that he could take his narcotic pain pill for his

back.

Two days later, Campbell informed Watt that he could not return to work until he

produced a letter from a doctor allowing Watt to perform work at GP with no restrictions.  Watt

returned with a note from his family physician stating that he could return to work with no

restrictions.  GP then sent Watt to Ashley Rehabilitation to obtain a functional capacity exam

("FCE").  Watt was not to return to work until GP obtained the FCE report.  The FCE report

indicated that Watt could only perform light-medium work, not the medium-heavy work that his

present job required.

---

[1]GP has filed affidavits of five beater engineers who stated that they were asked by their
supervisors to clean up around the machines they were not officially assigned to and to clean up
towel waste around the machines.

Watt was then placed on medical leave.  Watt remained on medical leave for twenty-six weeks without providing GP with a release to return to work.  According to a letter from a GP Human Resources employee to Watt, Watt was administratively terminated on March 13, 2005, because Watt had not been released to return to work after he exhausted his twenty-six weeks of accident and sickness benefits.  Watt never filed a grievance with PACE or otherwise reported to PACE the fact that he was placed on medical leave and eventually terminated.  Although Watt asserts the he discussed his termination with representatives from the Equal Employment Opportunity Commission (EEOC), the EEOC has no record that Watt submitted a charge of discrimination.  Watt does not have notice of right to sue from the EEOC.

Since his termination, Watt has never requested to be reinstated to his position as beater engineer.  Watt currently spends four or five days each week building portable buildings.  This process involves cutting lumber, lifting and maneuvering heavy pieces of cut lumber, operating a tractor and a forklift, and using a system of hooks and winches to lift the buildings onto a trailer. Watt stated that he has his son and brother-in-law help him out with some of the tasks at times. Watt works on these buildings between six and nine hours per day.

## II. STANDARD OF REVIEW

GP asserts that it is entitled to summary judgment on all of Watt's claims.  The standard of review for summary judgment is well established.  Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106

S.Ct. 2548, 91 L.Ed. 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct.

2505, 91 L.Ed. 202 (1986).  In deciding a motion for summary judgment, the Court must

consider all the evidence and all reasonable inferences that arise from the evidence in a light

most favorable to the nonmoving party.  *Nitsche v. CEO of Osage Valley Elec. Co-Op.*, 446 F.3d

841 (8th Cir. 2006).  The moving party bears the burden of showing that there is no genuine issue

of material fact and that it is entitled to judgment as a matter of law.  *Enterprise Bank v. Magna

Bank*, 92 F.3d 743, 747 (8th Cir. 1996).  Genuine issues of material fact exist where "there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."

*Anderson*, 477 U.S. at 249.  Where no reasonable jury could render a verdict for the plaintiff,

however, summary judgment is properly granted to a defendant.  *Taylor v. White*, 321 F.3d 710,

715 (8th Cir. 2003).

### III. DISCUSSION

#### A.  Watt's ADA claims

GP's first argument is that Watt failed to satisfy the administrative prerequisites to a

claim under the Americans with Disabilities Act.  The ADA requires claimants to exhaust certain

administrative prerequisites before they are permitted to file a lawsuit; one of these prerequisites

requires claimants to file a charge of discrimination with the EEOC within 180 days of the

alleged unlawful employment practice.  *See* 42 U.S.C. §§ 12117(a), 2000e-5.  Watt never filed a

charge of discrimination with the EEOC and never received a Notice of Right to Sue from the

EEOC.  Watt concedes that he does not have adequate evidence to support his ADA claim, and

this claim is dismissed.

B.  Watt's ACRA claims

Next, GP argues that Watt has failed to state a prima facie case of disability

discrimination under the Arkansas Civil Rights Act (ACRA).  Watt claims that the termination of

his employment violated ACRA.  ACRA creates a civil cause of action against employers who

discriminate against an otherwise qualified person on the account of the presence of any sensory,

mental, or physical disability.  *See* Ark. Code Ann. § 16-123-107(a)-(c) (Repl. 2006).  To state a

prima facie case of disability discrimination under ACRA, Watt must prove that (1) he has a

disability within the meaning of ACRA, (2) that he is able to perform his job requirements with

or without reasonable accommodation, and (3) that he suffered an adverse employment action as

a result of his disability.[2]  *Greer v. Emerson Electric Co*, 185 F.3d 917, 921 (8th Cir. 1999).

In order to prove that he is disabled, Watt must show that he has a physical or mental

impairment that substantially limits a major life activity.  Here, Watt's impairment is a back

injury.  Watt testified that he has difficulty standing for long periods of time on hard surfaces and

sitting for long periods of time in certain types of chairs.  He also testified that he occasionally

had trouble sleeping in cold weather and that his back condition kept him from hunting and

fishing at times.  Watt estimated that his total back pain amounted to one month per year.

According to Watt, his back pain is not constant and it bothers him more in the colder months.

Watt can walk without pain, and he has no trouble lifting things on a regular basis.

---

[2]Because the definition of disability in both ACRA and ADA is the same in all relevant
respects, ACRA claims are analyzed under the same principles as ADA claims.  *Greer*, 185 F.3d
at 920–21.  However, the statutes differ in that the ADA includes within its definition of the term
"disability" an individual who is regarded as disabled by his or her employer, 42 U.S.C. § 12102,
and ACRA does not include such language in its definition.  *Faulkner v. Ark. Children's
Hospital*, 347 Ark. 941, 954–55, 69 S.W.3d 393, 402 (2002) (refusing to extend coverage of
ACRA to include individuals who are regarded as being disabled by their employers).

Watt claims that his back injury substantially limits the major life activity of working.
However, to prove that he is substantially limited in the life activity of working, Watt must
demonstrate an inability to work in a broad class of jobs and show that he has suffered a
significant reduction in meaningful employment opportunities as a result of his impairments.
*Wood v. Crown Redi-Mix, Inc.*, 339 F.3d 682, 686 (8th Cir. 2003).  "An impairment that qualifies
a person from only a narrow range of jobs is not considered a substantially limiting one." *Id*.  A
substantially limiting impairment makes one unable to perform either a class of jobs or a broad
range of jobs in various classes.  *Samuels v. Kansas City Mo. Sch. Dist.*, 437 F.3d 797, 802 (8th
Cir. 2006).

Here, the FCE revealed that Watt was able to perform jobs at the light-medium level of
physical demand.   Watt makes the conclusory allegation that this restriction prevents Watt from
working in a broad class of occupations.  Watt states that the "harder jobs at Watt's department
such as fifth hand, back tender and machine tender would require Watt to be able to perform at
the medium/heavy to heavy level ...."  Watt has failed to offer proof that the limitation of
working on only light-medium level jobs  forecloses a *broad* category of jobs for which his
background and skills qualify him.  Watt states that he is unable to perform the "harder" jobs at
GP but offers no evidence as to how his functional limitation precludes him from performing
other jobs at the plant, in the community, or in the state.  Watt repeatedly claims that he was able
to perform all the jobs that he was required to do in his employment except for picking up towel
waste under machine four.  This claim contradicts Watt's argument that he is unable to do a
particular job or class of jobs, because Watt is claiming that he is still able to substantially
perform his previous job as beater engineer, with the exception of picking up towel waste under a

-7-

particular machine.  *See Pittari v. American Eagle Airlines, Inc.*, 468 F.3d 1056, 1062 (8th Cir. 2006) (holding plaintiff was not substantially limited in his ability to work when he could perform other functions for employer and was only limited in his ability to perform one job). Moreover, Watt has not sought other employment since his termination from GP and presently operates his own business making portable buildings.  Watt cannot show that he is substantially limited in his ability  to work.

Watt claims that he is limited in his performance of other major life activities as well. According to Watt, he occasionally is unable to hunt, fish, sit, or stand.  Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.  *Genthe v. Lincoln*, 383 F.3d 713, 716 (8th Cir. 2004) (quoting the non-exclusive enumeration of major life activities from 29 C.F.R.§ 1630.2(I)).  Fishing and hunting do not qualify as major life activities.  *Weber v. Strippit, Inc.*, 186 F.3d 907, 914 (8th Cir. 1999).  Watt testified that he is only occasionally limited in his ability to stand, sit, and sleep. His only limitation on standing is that he experiences some pain when forced to stand still on a hard-surface floor for over an hour at a time.  Watt cannot sit comfortably in only certain types of chairs and only experiences difficulty sleeping in the colder months of the year.  Watt testified that he normally has no trouble lifting, but when his back is acting up, he has experienced some trouble.  These limitations are moderate and do not prevent or severely restrict Watt from standing, sitting, and sleeping.  They are certainly inconvenient to his life but are insufficient to sustain an ACRA claim.  *See Wood*, 339 F.3d at 686.  Watt asserts that whether he is substantially limited in a major life function is a genuine issue of material fact.  However, even viewing the evidence in the light most favorable to Watt, the facts do not show that he has a

disability within the meaning of ACRA.  Thus, GP is entitled to summary judgment as a matter

of law, and Watt's ACRA claim is dismissed.

Even if Watt could prove his prima facie case of disability discrimination, GP argues that

Watt cannot prove that GP's articulated, nondiscriminatory reasons for his termination are false.

ACRA provides that an employer may avoid liability under ACRA if its actions were based on

legitimate, nondiscriminatory factors and not on unjustified reasons.  Ark Code Ann. § 16-123-

103(c) (Repl. 2006).  GP's letter to Watt states that GP terminated Watt because he failed to

return to work after twenty-six weeks on medical leave.  Pursuant to the terms of the Labor

Agreement between GP and PACE, employees who remain on a leave of absence for twenty-six

weeks will be removed from GP's payroll.  GP placed Watt on medical leave because  the results

of his FCE evaluation indicated that Watt could only perform work at the light/medium physical

level, and Watt's job of beater engineer was classified as a medium/heavy position.  Watt never

produced a letter from a physician that he could return to his job as beater engineer.  Watt has not

produced any evidence that even suggests that GP's reasons for his termination were a pretext for

discrimination.  Watt cannot show that he has a disability within the meaning of ACRA and

cannot show that GP's nondiscriminatory reasons for his termination are false or that the real

reason for his termination was discrimination.  Thus, GP is entitled to summary judgment on

Watt's ACRA claims.

   3.  Watt's Labor Agreement claims

Next, GP argues that Watt failed to satisfy the administrative prerequisites to bring his

claim that GP terminated his employment without cause in violation of the Labor Agreement

with GP.  GP argues that, in order to pursue such claims, Watt must have first exhausted the

grievance procedures to which GP and PACE agreed in the Labor Agreement.  *See Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).  Watt did not do this, and he concedes that he does not have adequate evidence to support his claim that GP terminated him in violation of the Labor Agreement.  Thus, this claim is dismissed.

Watt also claims that GP violated the Labor Agreement by assigning him tasks outside his job duties as beater engineer.  GP asserts that Watt's claims regarding job assignments are untimely.  Watt concedes that he does not have sufficient evidence to establish a claim for violation of the provisions fo the Labor Agreement concerning certain job assignments, and this claim is also dismissed.

### 4.  Watt's retaliation claims

In his response, for the first time, Watt claims that GP assigned him to duties outside of the beater engineer duties in violation of public policy.  Watt asserts that Senn retaliated against him for his testimony regarding the criminal proceeding in which Watt testified.  Watt asserts in his response to GP's summary judgment motion that GP improperly fired him because of his disability.  In the same response, Watt contends that GP terminated him in retaliation for his testimony in the criminal proceeding.  GP argues that Watt cannot state a prima facie case of retaliation.

Watt claims that he was ordered to perform duties outside his beater engineer position, because he had testified unfavorably in a criminal proceeding.  He, however, cannot show that this was the case.  The duties of all the beater engineers changed when GP and PACE agreed that the beater engineer position would be phased out.  This agreement was made in 2001, more than three years before Watt testified in the criminal proceeding.  After the agreement, beater

engineers were expected to be "available for troubleshooting in all areas as necessary." Watt

claims that cleaning up towel waste from under machine four was not his duty as a beater

engineer.  Affidavits from other GP beater engineers establish that beater engineers were

expected to fill in for absent employees, clean around machines, restock towels in lavatories, and

remove tissue waste from under the machines.  Watt has conceded that he cannot show that GP

violated the collective bargaining agreement with PACE by assigning him job duties outside his

position.  Moreover, Watt has offered no evidence to suggest that he was assigned certain duties

in retaliation for his unfavorable testimony except Watt's own belief that this was the case.

Similarly, Watt cannot show that he was terminated in retaliation for his testimony.  Watt

was not terminated until March 2005, more than three years after the fight about which Watt

testified.  The evidence shows that Watt was terminated after twenty-six weeks on medical leave

without providing GP with a release to return to his job.  Watt has offered no evidence that this

reason for his termination is false.  Watt cannot show a causal connection between his testimony

and his termination or his testimony and his being assigned specific job duties.  Thus, Watt's

retaliation claims must fail as a matter of law and these claims are dismissed.

### IV. CONCLUSION

For reasons discussed herein and above, the Court finds that Defendant Georgia-Pacific

Corporation's Motion for Summary Judgment should be and hereby is **GRANTED**.  An order of

even date, consistent with this opinion, shall issue.

**IT IS SO ORDERED**, this 29th day of May, 2007.

/s/Harry F. Barnes
Hon. Harry F. Barnes
United States District Judge